IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 4, 2024

**IN RE LOGAN F.**

**Appeal from the Chancery Court for Maury County**
**No. A-035-22          M. Caleb Bayless, Judge**
_____

**No. M2023-01280-COA-R3-PT**
_____

This appeal concerns a petition to terminate a father's parental rights. The trial court found by clear and convincing evidence that four grounds for termination existed: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) incarceration under a ten-year sentence; and (4) failure to manifest an ability and willingness to assume custody or financial responsibility. The trial court also found that termination was in the best interest of the child. The father appeals. We reverse the trial court's finding that clear and convincing evidence established the grounds of abandonment by failure to visit and abandonment by failure to support. However, we affirm its findings that the remaining grounds were proven and that termination was in the best interest of the child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Brandon E. White, Columbia, Tennessee, for the appellant, Mitchell S.

Cara E. Lynn, Columbia, Tennessee, for the appellees, Sarah J. and Nicholas J.

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

Mitchell S. ("Father") and Sarah J. ("Mother") are the biological parents of one child, Logan F., who was born out-of-wedlock in January 2011.[1]  Mother married Nicholas

---

[1] It is this Court's policy to refrain from using the full names of children and other parties in parental

J. in March 2020. In May 2022, Nicholas and Mother filed a petition in the chancery court for termination of Father's parental rights and adoption by Nicholas.[2] Father filed an answer denying that grounds existed to terminate his parental rights and denying that it was in the child's best interest for his parental rights to be terminated and for an adoption to occur. The court held a trial on the petition in May 2023. The court heard testimony from Mother, Nicholas, Father, and his wife, Kourtney.

Father testified concerning his criminal history. In early 2007, he was arrested for stealing vehicles from car lots, and he spent a year in jail. After he was released from incarceration, he began selling marijuana, and this was his primary source of income from 2008 to 2011, when Logan was born. He stated that Mother helped him in the business by weighing and bagging the marijuana and by keeping track of money. Father was arrested again in February 2011 for selling marijuana and hydrocodone, and he was released from incarceration in January 2012.

In February 2015, when Logan was four, Father was arrested again after law enforcement searched his home and found a ball of hash and a few firearms. He was criminally charged with the manufacturing of hash and possession with intent to resell. He additionally received a charge for "felon with a firearm." He received consecutive sentences totaling 14 years, and he went to jail on February 5, 2015. He remained in the county jail until February 2016, when he was transferred to prison. In prison, he passed all of his drug tests and completed classes and programs. He was released on parole on April 13, 2022, shortly before the termination petition was filed. Father further testified that his parole would end in March 2024. He stated that he still had to report to a parole officer and take drug tests. Father admitted, however, that he still uses marijuana "a couple times a week." However, he testified that he does not use any other drugs or alcohol.

Father stated that he was not present when Logan was born in January 2011 because he was "on the run." However, after Logan was born, Father spent two weeks with him until he was arrested in February 2011. When Father was released from incarceration in January 2012, he lived with Logan and Mother, and when he was home, he would spend the day with Logan. During this period, Father was often traveling to Washington to run his marijuana business. Father recalled that when he was in jail in 2015, Mother would bring Logan to visit him at the jail every Sunday, and Mother would let Father talk to Logan on the phone every day for the first three months. However, when he entered prison in 2016, Mother would not let Father talk to the child. Father testified that in July 2019, while he was in prison, he filed a petition in the juvenile court to establish paternity and to establish residential sharing time. In December 2019, Father filed a motion to compel DNA testing. Father further testified that the juvenile court ordered Mother to reimburse him for the cost of the DNA test and other court costs. Father also stated that after he was

---

termination cases in order to protect their identities.
    [2] Mother joined in the petition for the purpose of consenting to the adoption of Logan by Nicholas.

released from prison in April 2022, he filed a petition to establish residential sharing time with a proposed permanent parenting plan. Father attempted to contact Mother in order to see the child. He also attempted to give Mother $200 for the child through his attorney, but Mother returned it to the attorney. Father stated that he did not have a relationship with Logan anymore. He further admitted that he did not know anything about Logan's school or medical needs.

Father testified that he and Kourtney began their relationship in 2018 when he was in prison after he wrote her a letter. He stated that she had been convicted for kidnapping and burglary and served four years in incarceration. She was released from prison in January 2020. When Father was released from prison in April 2022, they "picked up [their] relationship" and got married in February 2023. Concerning his housing situation at the time of trial, Father testified that he rented a home with his wife. He stated that the home is clean and has a separate bedroom for Logan. Father also testified that he was employed and had money set aside for Logan in stocks.

The court next heard testimony from Mother. Mother testified that she started dating Nicholas in December 2018, and they got married in March 2020. She stated that Logan "liked [Nicholas] moving in" and "liked having his soon-to-be siblings living with [them]." She testified that Logan and Nicholas have a typical father/son relationship and that Nicholas helps Logan with schoolwork and coaches his sports teams. She further stated that Nicholas also helps with the day-to-day care of Logan by cooking and helping with chores. According to Mother, Logan also gets along with his step-siblings. She further explained that Logan is homeschooled and that he enjoys homeschooling and does well with his grades.

Mother also testified concerning her criminal history. She stated that she was aware that Father was involved in criminal activity, but she denied any involvement in helping him sell or weigh the marijuana. She explained that she was arrested on a criminal charge after driving Father's brother to a drug exchange, but she was not aware that it was a drug exchange. She was placed on probation. In February 2015, she was arrested again along with Father and her mother. She testified that she was charged with manufacturing, "possession with intent," and possession of a firearm while in the process of a dangerous felony. She was convicted of "possession with intent" and manufacturing. She was sentenced to four years of probation, and because she violated her probation from the previous case, she was sentenced to 60 days in jail but only served around 45 days in jail. Mother testified that she successfully completed probation, and she did not have any violations of probation. Concerning her history with the Tennessee Department of Children's Services ("DCS"), Mother stated that Logan was removed from her custody by DCS for approximately a month in February 2015 after a probation officer came to the home and found a gun in the closet and counterfeit money that Father had in a box underneath their bed.

Concerning her relationship with Father, Mother testified that she began dating him in 2008, and the relationship ended in 2015. After Father was arrested in 2011, she visited Father while he was in jail. Mother testified that while Father was incarcerated in 2011, he did not have any contact with Logan other than seeing the child through the glass at the jail. However, after Father was released from incarceration, Mother, Father, and Logan all resided together, and Father stayed home with Logan while Mother was working. Thereafter, Father began working again, and he started purchasing and selling marijuana in Washington. Mother also testified that when Father entered jail in 2015, Logan was four years old. When Father was in jail, she brought Logan to visit Father every Sunday. After the visits, Logan would be sad and would not be able to articulate why he was sad. Mother also explained that Logan was having "very big emotions and emotional outbursts," which included hitting and yelling at Mother. Mother started taking Logan to therapy, and because of his emotional state after the visits, she decided that it would be best for Logan to stop the visits with Father. After the visits stopped, Logan's behavioral issues improved significantly. She further testified that Father never made any payments in child support. Mother believed that reintroducing Logan to Father would be "extremely hard on him emotionally" because he thrives on consistency and because being "released to a stranger" would be difficult. She further explained that Logan never talks about Father and that he quit talking or asking about Father around 2018. She also stated that Logan has very few memories of Father. Logan was twelve years old by the time of trial.

Nicholas also testified. He testified that his relationship with Logan was initially good until Logan became jealous for a period of time after "realiz[ing] that there was an actual relationship building" between Nicholas and Mother. Nicholas stated, however, that his relationship with Logan had gotten better and that they had a father-son relationship with each other. He explained that they cook, watch television programs, and play video games together. He stated that he takes care of Logan by cooking for him and by making sure that he does his chores and schoolwork and by making sure that he behaves when he is out with friends. Nicholas further testified that he does not treat Logan differently than he treats his biological children.

The court also heard testimony from Father's wife, Kourtney. Concerning her criminal history, Kourtney testified that she pled guilty to charges of robbery and attempted aggravated kidnapping in April 2016. She was sentenced to 12 years of incarceration, and she spent 21 months in county jail and 22 months in the women's therapeutic residential center. In the county jail, she completed the fresh start program and taught classes in prison for Celebrate Recovery, AA, and NA. She became sober in January 2018, and she has not had any relapses since then. She was released on parole in January 2020. Kourtney testified that she works with Father and lives with him in a home with a room for Logan. She stated that it was her hope that Father and Logan would be reunited, and she further stated that she wished to support Father and Logan. She further testified that she has never known Father to be violent, and she characterized Father as "very honest, very loyal, very hard working, kind, [and] considerate." Kourtney further testified that Father smoked

- 4 -

marijuana a few times a week, but he did not smoke marijuana in their home or in their car.

In August 2023, the trial court entered an order terminating Father's parental rights on the following grounds: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) failure to manifest an ability and willingness to assume custody or financial responsibility; and (4) incarceration under a ten-year sentence. The court further found that it was in the best interest of the child for Father's parental rights to be terminated. Father filed a timely notice of appeal.

## II. ISSUES PRESENTED

Father presents the following issues for review on appeal, which we have slightly restated:

1. Whether the trial court erred in not analyzing whether Father abandoned the child by failing to visit during the four consecutive months immediately preceding Father's incarceration;
2. Whether the trial court erred in not analyzing whether Father abandoned the child by failing to pay child support or otherwise financially support the child during the four consecutive months immediately preceding Father's incarceration;
3. Whether the trial court erred in finding that Father waived the right to argue at trial that he did not willfully fail to visit and did not willfully fail to pay child support;
4. Whether the trial court erred in finding that petitioners proved by clear and convincing evidence that Father's parental rights should be terminated based on Father being sentenced to a term of confinement of ten or more years at a time when the child was less than eight years of age;
5. Whether the trial court erred in finding that Petitioners proved by clear and convincing evidence that Father's parental rights should be terminated for failure to manifest an ability and willingness to assume legal and physical custody of the child, and placing the child in the legal and physical custody of Father would pose a substantial risk of harm to the child's physical or psychological welfare;
6. Whether the trial court erred in finding that Petitioners proved by clear and convincing evidence that terminating Father's parental rights was in the best interest of the child.

For the foregoing reasons, we affirm in part and reverse in part the decision of the chancery court and remand for further proceedings consistent with this opinion.

## III. STANDARDS APPLICABLE TO TERMINATION CASES

It is well established that "[a] parent's right to the care and custody of [his or] her

- 5 -

child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016). "Parental rights have been described as 'far more precious than any property right.'" *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 522). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interests of the children under the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims* (*In re N.B.*), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

Because of this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d at 861. We review the juvenile court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). In regard to conclusions of law, "[t]he trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV.  DISCUSSION

### A.  Grounds for Termination

#### 1.  Incarceration Under a Ten-Year Sentence

The first ground for termination at issue on appeal exists when "[t]he parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court[.]" Tenn. Code Ann. § 36-1-113(g)(6). This ground "is not based on the parent's actions or knowledge, but is based on the parent's status—i.e., having received a prison sentence of ten or more years." *In re Adrianna S.*, 520 S.W.3d 548, 560 (Tenn. Ct. App. 2016). "If a parent is confined in any type of facility under a criminal sentence of ten or more years and the child is under the age of eight when the sentence is entered, the conditions of the statute are met and grounds exist to terminate that parent's rights." *In re LaiLonnii J.*, No. E2018-01198-COA-R3-PT, 2019 WL 669758, at *4 (Tenn. Ct. App. Feb. 19, 2019) (citing *In re D.M.*, No. M2009-00340-COA-R3-PT, 2009 WL 2461199, at *3 (Tenn. Ct. App. Aug. 12, 2009)). This Court has previously held that consecutive sentences can be combined for the purposes of this statutory ground. *See, e.g.*, *In re Jamazin H.M.*, No. W2013-01986-COA-R3-PT, 2014 WL 2442548, at *5 (Tenn. Ct. App. May 28, 2014); *In re E.M.P.*, No. E2006-00446-COA-R3-PT, 2006 WL 2191250, at *6 (Tenn. Ct. App. Aug. 3, 2006); *H.M.R. v. J.K.F.*, No. E2004-00497-COA-R3-PT, 2004 WL 1944138, at *5 (Tenn. Ct. App. Sept. 1, 2004).

In May 2011, Father pled guilty to two counts for the sale of schedule III substances and received two four-year sentences to run consecutively. Although he was placed on probation, in March 2015, Father's probation was fully revoked for the 2011 sentences. In February 2016, while incarcerated, Father pled guilty to one count for the resale of a schedule VI substance in a drug-free zone for which he received a four-year sentence to run consecutively with one of the previously-imposed four-year sentences. Father also pled guilty to one count for the manufacturing of a schedule VI substance for which he received a two-year sentence to run consecutively with the other sentence he received in February 2016. Thus, Father was sentenced to a total of 14 years to serve in the Tennessee Department of Corrections, and he entered prison in May 2016. As previously discussed, Logan was born in January 2011, and he was under 8 years old when Father was sentenced.

Father argues, however, that this ground should not apply to him because he had already been released on parole by the time the petition for termination was filed. This Court, however, has previously affirmed a finding of this ground when the parent was released from incarceration. For instance, in *In re D.M.*, 2009 WL 2461199, at *3, the father argued that the statute did not apply to him because he had completed the ten-year sentence by the time the trial court terminated his rights. We rejected this argument, stating that "[t]his particular statutory ground . . . contains no such limiting language." *Id.* We reasoned:

> Father would have us impose upon the statute a requirement that the termination be effectuated during the 10-year sentence or, as Father's brief

phrases it, to "infer boundaries" on the statute. There is no such requirement in the statute. Statutes are to be construed without any "forced or subtle construction which would extend or limit its meaning." *Bryant v. Baptist Health System*, 213 S.W.3d 743, 749 (Tenn. 2006). In other statutory grounds, the legislature has placed time limitations on when the petition is to be filed. *See e.g.*, Tenn. Code Ann. § 36-1-102(1)(A)(i) (petition to be filed when for four consecutive months "immediately preceding" parent has not visited or not supported). Clearly, the legislature could have placed restrictions in Tenn. Code Ann. § 36-1-113(g)(6), yet it did not. Absent language in the statute evidencing legislative intent to place a requirement that the termination order be entered while the parent is serving a 10-year sentence, we decline to do so.

*Id.* We further stated that "[t]he legislature decided that whatever else may be the case, if a parent is sentenced to [ten years] or more and the child is under 8, then *grounds* exist to terminate parental rights." *Id.*

Furthermore, in *In re Adoption of K.B.H.*, 206 S.W.3d 80, 84 (Tenn. Ct. App. 2006), the father argued that the trial court erred in its application of Tennessee Code Annotated section 36-1-113(g)(6) because he was scheduled for release before the completion of his sentence. We rejected the father's argument and stated that "[u]nder Section 113(g)(6) . . . the legislature has established a 'bright line' ground for termination of parental rights." *Id.* at 85. We further reasoned that "[a]t the time the statute was enacted, the legislature was certainly aware of parole and other means by which a prisoner could end up released from his or her incarceration prior to expiration of the full sentence, and did not include such circumstances in the language of the statute." *Id.*

Father asks this Court to overrule its prior decisions and hold that this ground is inapplicable to a parent who has been released on parole by the time the termination petition is filed. We decline to adopt Father's proposed limit on the applicability of this statutory ground. The statute clearly provides that a ground for termination exists if the parent has been confined in a facility of any type under a criminal sentence of ten years or more and the child is under eight years of age at the time of the sentence. *See* Tenn. Code Ann. § 36-1-113(g)(6). We have "repeatedly recognized that a court considering a petition for termination of parental rights based on Tennessee Code Annotated section 36-1-113(g)(6) need not look beyond the judgment of conviction and the sentence imposed by the criminal court in order to determine whether this ground for termination applies." *In re Hayden L.*, No. E2018-00147-COA-R3-PT, 2018 WL 4190986, at *10 (Tenn. Ct. App. Aug. 31, 2018) (quoting *In re Audrey S.*, 182 S.W.3d at 876 (citations omitted)). Thus, "[i]t does not matter that [Father] served less than ten years; we only look at the length of the sentence and age of the child at sentencing." *In re S.D.*, No. M2015-01932-COA-R3-PT, 2018 WL 6012537, at *4 (Tenn. Ct. App. Nov. 15, 2018).

Based on Father's incarceration under an effective sentence of more than ten years entered while the child was under the age of eight, we conclude that there is clear and convincing evidence to support this ground for termination of his parental rights.

## 2. Failure to Manifest an Ability & Willingness to Assume Custody or Financial Responsibility

The second ground for termination at issue in this case is failure to manifest an ability and willingness to assume custody or financial responsibility. This ground exists when:

> A parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child . . .

Tenn. Code Ann. § 36-1-113(g)(14). There are two prongs necessary to prove for this ground: "(1) the parent . . . failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d at 674.

Our supreme court has explained that the first prong "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Therefore, if the petitioner "seeking to terminate parental rights proves by clear and convincing proof that a parent . . . has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at \*13 (Tenn. Ct. App. June 20, 2018)). A parent's ability is evaluated based "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at \*5 (Tenn. Ct. App. Apr. 9, 2020) (quoting *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at \*7 (Tenn. Ct. App. May 31, 2018)). A parent demonstrates willingness, on the other hand, "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.* (citing *In re Ayden S.*, 2018 WL 2447044, at \*7). "The analysis of a parent's failure to manifest an ability and willingness to assume custody or financial responsibility focuses on the parent's actions throughout the life of the child." *In re Isabella G.*, No. M2022-00246-COA-R3-PT, 2023 WL 1131230, at \*12 (Tenn. Ct. App. Jan. 31, 2023) (citing *In re Neveah M.*, 614 S.W.3d at 677).

As for the second prong, a court "examines the effect that placing the child in the parent's custody would have on the child—namely, whether the parent's assumption of

custody would present 'a risk of substantial harm to the physical or psychological welfare of the child.'" *In re Sylvia H.*, No. E2020-01009-COA-R3-PT, 2021 WL 1098630, at *7 (Tenn. Ct. App. Mar. 23, 2021) (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

First, we address Father's ability and willingness to assume custody for the child. When Logan was born, Father was "on the run" due to a warrant for his arrest for the sale of marijuana and hydrocodone. Father was subsequently arrested and spent one year in jail. After his release, he continued to sell marijuana until his arrest in February 2015. Father's continuous involvement with drugs and his subsequent incarceration for the majority of the child's life reveal that Father was unable and unwilling to care for the child and to assume custody of the child. Furthermore, although we recognize that Father filed a petition to establish residential sharing time after he was released from prison, Father's continued usage of marijuana while he was on parole evinces a lack of willingness to assume custody of Logan. *See In re Amynn K.*, 2018 WL 3058280, at *15 (finding a lack of willingness to assume custody of the child when the father engaged in "continued criminal activity"). Therefore, we find that the first prong of this ground is satisfied.

Second, we address whether placing the child in Father's custody would pose a risk of substantial harm to the physical or psychological welfare of the child. Due to Father's incarceration for the majority of the child's life, Father has not spent a considerable amount of time with Logan since 2015. As a result, Father and Logan do not have any substantial relationship, and Logan does not regularly mention Father or inquire about his father. We have previously held that "when a parent is essentially a stranger to a Child, and the Child is thriving and bonded in his or her current household, forcing the child to begin visitation with the estranged parent is likely to cause psychological harm to the child." *In re Isabella G.*, 2023 WL 1131230, at *12. We therefore find that placing Logan in Father's custody would pose a risk of substantial harm to Logan's psychological welfare. Accordingly, we conclude that the trial court did not err in finding that Petitioners proved by clear and convincing evidence the ground of failure to manifest an ability and willingness to assume custody or financial responsibility of the child as to Father.

### 3. Abandonment – Failure to Visit and Failure to Support

Abandonment is one potential ground for termination of parental rights. Tenn. Code Ann. §§ 36-1-102(1)(A), -113(g)(1). However, there are several alternative definitions of abandonment. Under section 36-1-102(1)(A)(i), "abandonment" occurs when a parent fails to visit, fails to support, or fails to provide reasonable payments toward the support of the child for a period of four consecutive months immediately preceding the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i).

On May 19, 2022, one month after Father was released from prison, Petitioners filed their petition to terminate Father's parental rights. Petitioners alleged in their petition that Father had "abandoned the minor child pursuant to [Tennessee Code Annotated] section

36-1-102[.]" At trial, during opening arguments, the trial court asked Petitioners' counsel whether the four months preceding the filing of the petition was the correct period for the ground of abandonment, to which Petitioners' counsel agreed. In its order terminating Father's parental rights, the trial court found that the Petitioners proved by clear and convincing evidence both abandonment by failure to support and abandonment by failure to visit, stating:

> It is undisputed . . . that [Father] became incarcerated in 2015 and was not released from prison until April 13, 2022. [Father] did not see the minor child any in 2022, which covers the relevant statutory period. Due to willfulness not being pled, the Court cannot even consider that [Father] was incarcerated and not capable of visiting the minor child. Furthermore, [Father] paid $0 in child support during this time frame. . . .

It is apparent that the trial court considered the four-month period preceding the filing of the petition pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(i). However, due to Father's incarceration during part of the four months preceding the filing of the termination petition, we find that subsection (i) was an improper ground for parental termination. *See In re A.V.N.*, No. E2020-00161-COA-R3-PT, 2020 WL 5496678, at *7 (Tenn. Ct. App. Sept. 10, 2020). This Court has repeatedly held that subsection (i) is inapplicable "where the parent has been incarcerated during all or part of the four months preceding the filing of the termination petition." *In re Allainah B.*, No. M2020-01381-COA-R3-PT, 2021 WL 4453465, at *6 (Tenn. Ct. App. Sept. 29, 2021) (quoting *In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *7 (Tenn. Ct. App. Apr. 14, 2020)).

Because Father was incarcerated from February 5, 2015 until April 13, 2022, the definition of abandonment in subsection (iv) is applicable in this case. *See id.* Subsection (iv) provides, in relevant part, that "abandonment" can occur when:

> (iv) A parent . . . is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, or a parent . . . has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
>
> (a) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's . . . incarceration . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv). The salient four-month period would have been the four months preceding Father's incarceration on February 5, 2015. *See In re Allainah B.*, 2021 WL 4453465, at *6.

- 11 -

We emphasize that "courts must strictly comply with procedural requirements in termination of parental rights cases." *In re Landon H.*, No. M2011-00737-COA-R3-PT, 2012 WL 113659, at *6 (Tenn. Ct. App. Jan. 11, 2012) (citing *Weidman v. Chambers*, No. M2007-02106-COA-R3-PT, 2008 WL 2331037, at *6 (Tenn. Ct. App. June 3, 2008)). One such procedural requirement is that parents must be afforded sufficient notice of the ground being sought for termination of parental rights. *See id.* Unless the ground is tried by implied consent, if the ground is not properly pled, it cannot be considered as a potential ground for termination of parental rights. *See, e.g.*, *In re Justine J.*, No. E2019-00306-COA-R3-PT, 2019 WL 5079354, at *8 (Tenn. Ct. App. Oct. 10, 2019); *In re K.N.B.*, No. E2014-00191-COA-R3-PT, 2014 WL 4908505, at *13 (Tenn. Ct. App. Sept. 30, 2014); *In re Eimile A.M.*, No. E2013-00742-COA-R3-PT, 2013 WL 6844096, at *5 (Tenn. Ct. App. Dec. 26, 2013). So, when abandonment is pled as a potential ground for termination, the petitioner must include the correct four-month period. *See In re Allainah B.*, 2021 WL 4453465, at *6; *In re Haskel S.*, No. M2019-02256-COA-R3-PT, 2020 WL 6780265, at *6 (Tenn. Ct. App. Nov. 18, 2020); *In re A.V.N.*, 2020 WL 5496678, at *8. Petitioners failed to state in their petition the correct four-month period pursuant to subsection 36-1-102(1)(A)(iv), and Petitioners never amended their pleadings to include subsection (iv) and did not apply the correct four-month period in their arguments at trial. In the absence of such a pleading, amendment, or trial by implied consent, this ground cannot be considered by this Court in determining whether to terminate Father's parental rights. *Id.* at *7.

In sum, due to Father's incarceration during part of the four months preceding the filing of the petition, Tennessee Code Annotated section 36-1-102(1)(A)(i) is not a proper ground for termination of his parental rights. Instead, section 36-1-102(1)(A)(iv) contained the applicable definition of abandonment. Thus, the trial court erred in finding that abandonment by failure to visit and abandonment by failure to support were sufficiently proven against Father because he failed to visit or support in the four months preceding the filing of the petition. Therefore, we must reverse the trial court's finding of abandonment by Father due to a failure to support and failure to visit under Tennessee Code Annotated sections 36-1-102(1)(A)(i) and 36-1-113(g)(1).

### B. Best Interest of the Child

We now turn to address whether the trial court erred in finding that it was in the best interest of the child to terminate Father's parental rights. Our supreme court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's

- 12 -

best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017). The twenty statutory best-interests factors are:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive

relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1)(A)-(T). "When considering the factors [above], the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

We first address those interrelated factors concerning the child's critical need for stability and continuity of placement, the effect a potential change of caretakers and physical environment would have on the child, and the child's parental attachments. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A), (B), and (H). Logan deserves stability, and he has experienced stability in his home with Mother and Nicholas, where he has developed a strong relationship with Nicholas and his children. In contrast to the stability and relationships Logan has experienced in his home with Mother and Nicholas, Logan has not lived with Father since Father was arrested in 2015, and he does not have a relationship with Father. We find that factors (A), (B), and (H) weigh in favor of termination.

Due to Father's incarceration, Father has not demonstrated continuity and stability in meeting Logan's needs and has failed to provide safe and stable care for the majority of Logan's life. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C), (O). Likewise, also due to Father's incarceration, he has not maintained regular visitation or contact with Logan, and consequently, he did not cultivate a positive relationship with him. *See* Tenn. Code Ann. § 36-1-113(i)(1)(E). As a result, Father and Logan do not have a secure and healthy parental attachment or any relationship at all, and there is no reasonable expectation that he could create such attachment. *See* Tenn. Code Ann. § 36-1-113(i)(1)(D). Therefore, we find that factors (C), (D), (E), and (O) weigh in favor of termination.

During his incarceration, Father participated in many programs in order to be

released. While we commend Father's effort in completing these programs, we also note that Father has continued to use marijuana "a couple times a week" *while on parole*. Father's continued drug use reveals that Father has not utilized these programs to achieve a lasting adjustment of circumstances that would enable him to consistently care for Logan in a safe and stable manner. *See* Tenn. Code Ann. § 36-1-113(i)(1)(J), (K). Likewise, due to Father's continued drug use while on parole, we find that Father has failed to demonstrate a sense of urgency in ensuring that it was safe for Logan to be in his custody or an understanding of Logan's need for stability at his age. *See* Tenn. Code Ann. § 36-1-113(i)(1)(M), (P). Thus, we find that factors (J), (K), (M), and (P) weigh in favor of termination.

Father has not shown any abuse or neglect toward Logan or any other child. *See* Tenn. Code Ann. § 36-1-113(i)(1)(N). Furthermore, although Father has continued to use marijuana while on parole, Kourtney testified that he does not smoke marijuana in his home. Father maintains a clean home that is otherwise safe and healthy for Logan and meets Logan's needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(Q), (R). We find that factors (N), (Q), and (R) weigh against termination.

Regarding factor (S), Father has not provided more than token financial support for the child. *See* Tenn. Code Ann. § 36-1-113(i)(1)(S). Although we recognize that Father attempted to provide $200 in support after he was released from incarceration, we note that Father has not provided financial support for most of the child's life. We find that this factor weighs in favor of termination.

We find that factors (F), (G), (I), (L), and (T) are inapplicable. The court heard no testimony regarding whether Logan would be fearful of living in Father's home or whether Father's home would exacerbate or trigger Logan's experience of trauma or post-traumatic stress. *See* Tenn. Code Ann. § 36-1-113(i)(1)(F), (G). Likewise, although Logan has clearly established significant relationships with Nicholas and his step-siblings, the court heard no testimony concerning the impact of various outcomes on these relationships or on Logan's access to information about his heritage. *See* Tenn. Code Ann. § 36-1-113(i)(1)(I). DCS was not involved in this case. *See* Tenn. Code Ann. § 36-1-113(i)(1)(L). Furthermore, there was no testimony concerning whether Father's mental or emotional fitness would be detrimental to the child. *See* Tenn. Code Ann. § 36-1-113(i)(1)(T). Therefore, we do not consider factors (F), (G), (I), (L), and (T).

We have reviewed the best interest factors and agree that it is in the best interest of Logan for Father's parental rights to be terminated. Accordingly, we conclude that the trial court did not err in finding that termination was in the best interest of Logan.

## V. CONCLUSION

For the aforementioned reasons, we affirm in part and reverse in part the decision

of the chancery court. The case is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellant, Mitchell S., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE